# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

PEGGY TYLER,                               )

     PLAINTIFF,                          )

VS.                                        )          **2:06-cv-449-JHH**

AIG LIFE INSURANCE CO.,                    )

     DEFENDANT.                          )


## MEMORANDUM OF DECISION

The court has before it two motions for summary judgment.  Plaintiff Peggy

Tyler filed a motion (doc. # 14) for summary judgment on February 1, 2007.

Defendant AIG Life Insurance Company also filed a motion (doc. #13) for

summary judgment on February 1, 2007.   Pursuant to the court's February 2, 2007

order (doc. #20), the motions were deemed submitted, without oral argument, on

March 1, 2007.

### I. Procedural History

Plaintiff Peggy Tyler commenced this action on March 8, 2006 by filing a

complaint in this court alleging violations of the Employee Retirement Income

Security Act (ERISA), 29 U.S.C. § 1001 et seq.  Plaintiff contends that

defendant's refusal to pay benefits constitutes a violation of ERISA.  Tyler and

AIG both filed motions for summary judgment, asserting that no genuine issue of

material fact exists and that each is entitled to judgment as a matter of law.

The parties have filed briefs and submitted evidence in support of their

respective positions.  Plaintiff submitted a brief (doc. #15) and evidence[1] (docs. #

16-19) in support of her motion for summary judgment on February 1, 2007.

Defendant submitted a brief (attachment 1 to doc. # 13), supplemental brief (doc.

#21) and evidence[2] (attachment 2 to doc. #13) in support of its own motion for

summary judgment on February 1, 2007 and February 8, 2007.  On February 22,

2007, defendant filed a brief (doc. #24) and evidence[3] (attachment 1 to doc. #24)

in opposition to plaintiff's motion for summary judgment.  On February 22, 2007,

---

[1] The plaintiff submitted the following evidence: AIG administrative record; AIG accidental death policy; deposition of Felicia Bailey; deposition of Deputy Billy Watts; excerpts of deposition of Detective Curtis Williams; deposition of Dr. Gary T. Simmons; Reliance Standard Insurance Company claims file for Shirley Bailey; Liberty Life Assurance Company claims file for Shirley Bailey.

[2] The defendant submitted the following evidence: affidavit of Myra Zimmerman; AIG policies; AIG administrative report; Alabama Uniform Incident/Offense Report; deposition of Billy Watts; deposition of Curtis Williams; deposition of Felicia Bailey; audio tape interview by Detective Williams of Felicia Bailey; audio tape interview by Detective Williams of Timothy Seagle; deposition of Dr. Gary T. Simmons; affidavit of Dr. Vincent J.M. Di Maio; curriculum vitae of Dr. Di Maio; expert report of Dr. Di Maio.

[3] The defendant submitted the following additional evidence: affidavit of Francine Aubin; Group Life Insurance Policy number SA3-850-278490-01.

plaintiff filed a brief (doc. # 23) and evidence[4] (attached to doc. #23) in opposition to defendant's motion for summary judgment.  On March 1, 2007, defendant filed a brief (doc. # 26) in reply to plaintiff's opposition to its motion, and plaintiff filed a brief (doc. #25) in reply to defendant's opposition to her motion.  Except as provided in the court's April 30, 2007 order (doc. # 35), all briefs and evidence have been considered.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond

---

[4] The plaintiff submitted the following additional evidence: defendant's response to plaintiff's first interrogatories.

the pleadings and by its own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are

irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All

reasonable doubts about the facts and all justifiable inferences are resolved in

favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115

(11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge

its initial burden depends on whether that party bears the burden of proof on the

issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four

Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving

party bears the burden of proof at trial, then it can only meet its initial burden on

summary judgment by coming forward with positive evidence demonstrating the

absence of a genuine issue of material fact; i.e. facts that would entitle it to a

directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once

the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the

5

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

*A.  The Incident*

On April 18, 2004, Shirley Bailey,[6] a thirty-year old woman, and her ten

year old daughter Felicia, were riding in a Ford Explorer driven by Bailey's

boyfriend, Timothy Seagle.  (Felicia Bailey Dep. at 23, 68.)  The Explorer was

---

[5]  Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (5th Cir. 1955); Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  See Wright, Miller & Kane, Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998).

The court also notes that in the Eleventh Circuit, under de novo review (the standard relevant here, see infra section IV), the court may examine facts that were not available to the plan administrator at the time of the decision.  Moon v. Am. Home Assurance Co., 888 F.2d 86, 86 (11th Cir. 1989).

[6]  The court notes that the police reports indicate that the victim's name was Shirley Vaughn.  The parties and all other portions of the record state her last name as Bailey.

pulling a trailer with a refrigerator on it.  (Id. at 24-25.)  Bailey was sitting in the

passenger's seat, and Felicia was in the middle of the back seat working a word

puzzle.  (Id. at 27, 56.)  Seagle and Bailey were arguing over something that

Seagle had said during a phone conversation.  (Id. at 29, 59.)

The vehicle made a turn onto a residential street, and approximately thirty

seconds later, as the vehicle was moving, Bailey jumped out of the car.[7]  (Id. at 29,

59.)  Felicia Bailey testified in her deposition that she did not see her mother jump

from the vehicle, but she does recall seeing her mother open the car door.  (Id. at

57.)  According to Felicia, the car was moving slowly at the time her mother

jumped out of the car.  (Id. at 69.)

Deputy Billy Watts of the Jefferson County Sheriff's office was the lead

officer at the scene.[8]  (Watts Dep. at 7, 10.)  When he arrived on the  scene Deputy

Watts interviewed both Seagle and Felicia Bailey.  (Id. at 21, 48.)  Deputy Watts

observed Bailey lying on her back on the side of the road parallel to the rear axle

of the trailer.  (Id. at 16, 56.)  She was bleeding "pretty profusely" from her head.

(Id. at 17-18.)  He further observed that the position of her body "indicat[ed that]

_____

[7]  It is undisputed that Bailey jumped out of the car and that she was not pushed or forced
out of the car.  It is also undisputed that there was nothing wrong with the door of the car that
made her fall out unintentionally.

[8]  Deputy Brian Williams was the first officer on the scene, but Deputy Watts was the
reporting Deputy.  (Watts Dep. at 45-46.)

Mr. Seagle had stopped immediately and was not going more than 20-25 mph."

(Watts Incident Report, Def.'s Ex. B at 3; see also Watts Dep. at 35.)

Deputy Watts drew a diagram of the scene. (Watts Dep. at 49-50; Watts

Incident Report at 12.) The diagram shows the Ford Explorer pulling a trailer on

Paradise Lane, "a very short [residential] street", approximately 25 yards long.

(Watts Incident Report at 12; Watts Dep. at 76-77.) Deputy Watts testified in his

deposition that "it would be very hard to get up any amount of speed at all before

coming to the next intersection" and having to break for the stop sign at the end of

the street. (Id. at 77-78.) The diagram also indicates a blood stain located four

feet away from the rear axle of the trailer, toward the side of the road. (Id. at 56.)

Deputy Watts could not estimate how far off the side of the road Bailey's body

was located.[9] (Id.)

Deputy Watts followed Seagle to a sheriff's station located in Center Point,

Alabama. (Id. at 25-26.) Another officer, Deputy Brian Williams, took Felicia to

the station. (Id. at 25.) Deputy Watts remained at the station while Seagle and

Felicia were interviewed by Detective Curtis Williams to ensure that Felicia was

picked up by a relative. (Id. at 27-28.) He did not have any further involvement in

---

[9] At the time he drew the diagram, Bailey's body had been moved by medical personnel. (Watts Dep. at 58.)

the investigation.  (Id. at 28-29.)

Bailey was airlifted to the University of Alabama at Birmingham hospital. (Watts Incident Report at 3.)  She was unconscious when she arrived at the hospital and had severe head trauma along with numerous abrasions on the right side of her body.  (Offense Report Supplement, Def.'s Ex. B at 6.)  Bailey died two days later, on April 20, 2004.  (See id.)

### B.  The Autopsy

Dr. Gary T. Simmons, the Associate Coroner/Medical Examiner for Jefferson County, Alabama, performed the autopsy on Bailey. (Simmons Dep. at 7, 12, 19.)  Dr. Simmons prepared an autopsy report regarding Bailey's death.[10]  (See Administrative Record at 40, 43-51.)

During the autopsy, Dr. Simmons observed Bailey had an injury on the back left of her head and widely scattered bruises on her body, predominately on her arms, that were not particularly striking.  (Simmons Dep. at 19-20.)  Bailey also had a scrape on her left flank.  (Id.)  She tested negative for  drugs and alcohol in a blood test at the coroner's office. (Id. a 37, 70-71.)  Dr. Simmons testified in his

---

[10] In preparing the report, Dr. Simmons reviewed Ms. Bailey's medical records from UAB Hospital, the investigative report prepared by the Deputy Coroner, Pat Curry, who took the original death call, and the police report.  (Simmons Dep. at 14.)  Additionally, an investigator at the coroner's office, Stan Pitts, spoke with Detective Curtis Williams about the case and the investigation, and Pitts passed this information to Dr. Simmons. (Id.)

deposition that based on his external examination there was evidence of injury but not overwhelming injury, other than her head injury.  (<u>Id.</u> at 20.)  Dr. Simmons found nothing significant internally except for Bailey's head. (<u>Id.</u>)  He observed a skull fracture extending from the left back and a "contrecoup injury," which occurs when a moving head hits a stationary object.  (<u>Id.</u> at 21.)  Dr. Simmons concluded that Bailey died from head trauma, specifically from a subdural hematoma, or bleeding between the brain and the skull, and he certified her manner of death as accidental.[11]  (<u>Id.</u> at 22-23; Administrative Record at 40, 43, 49.)

## C.  The Policies

Bailey was a participant in an accidental death and dismemberment benefit plan through her employer, Regions Financial Corporation in Birmingham, Alabama. (Zimmerman Aff. ¶ 2).  Under the plan, Bailey had coverage through two policies of insurance issued by AIG Life Insurance Company.  (<u>Id.</u>)  Plaintiff Peggy Tyler was the named beneficiary under both policies.  (<u>Id.</u>)

Both policies provide coverage for the death of an insured if an insured is injured, as defined by the policy, and that injury results in death within a year of

---

[11] Dr. Simmons ruled out the possibility of homicide and suicide.  (Simmons Dep. at 25-30, 45-47, 101.)

the date of the accident that caused the injury.  (See Ex. 1 to Zimmerman Aff. at

12, 42.[12])  The policies define injury in similar ways.  One policy defines injury as

"bodily injury: (1) which is sustained as a direct result of an unintended,

unanticipated accident that is external to the body . . . , and (2) which directly . . .

causes a covered loss."  (Id. at 28.)  The second policy defines injury as "bodily

injury caused by an accident . . . and resulting directly and independently of all

other causes in a covered loss."  (Id. at 40.)  Neither of the policies define the term

"accident."

Both policies exclude coverage for suicide, attempted suicide, intentional

self-inflicted injury, or attempted self-inflicted injury.  (Id. at 13, 43.)

Specifically, one policy states as follows:

> No coverage shall be provided under the Policy and no payment shall
> be made for any loss resulting in whole or in part from, or contributed
> to by, or as a natural and probably consequence of any of the
> following excluded risks even if the proximate or precipitating cause
> of the loss is an accidental bodily injury: 1) suicide or any attempt at
> suicide or intentionally self-inflicted injury or any attempt at
> intentionally self-inflicted injury or auto-eroticism. . . .

(Id. at 13.)  The other policy states that the policy "does not cover any loss caused

in whole or in part by, or resulting in whole or in part from, the following: 1)

---

[12] The page numbers referenced by the court regarding the policies are actually the bates stamped numbers on the bottom right-hand corner of the documents attached as Exhibit 1 to Zimmerman's affidavit.

suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury. . . ."  (Id. at 43.)[13]

### C. The Claim Determination and Appeal

On June 28, 2004, Tyler, the designated beneficiary under the policies, submitted a proof of loss and claim for accidental death benefits to AIG. (Administrative Record at 100.)  In detailing how the accident occurred, Tyler stated that Bailey "jumped out of [a] moving vehicle." (Id. at 105.)  On July 7, 2004, AIG confirmed receipt of the request for benefits and informed Tyler that its investigative services department was obtaining additional information to review the claim.  (Id. at 103.)

AIG issued a denial letter to Tyler on October 4, 2004.  (Id. at 81-83.)  The letter stated that AIG determined that "Ms. Bailey intentionally jumped from a moving vehicle traveling between 20-25 miles per hour.  Under the circumstances, it is reasonable to expect that serious bodily injury or death would likely occur as a result.  Her actions were not an accident (she meant to jump) and her injuries were a result of her intentional actions."  (Id.)

On January 14, 2005, Tyler notified AIG of her intent to appeal the decision

---

[13] The court views the definitions and exclusions under the two policies to be the same. The parties agree with this view.

to deny benefits.  (<u>Id.</u> at 69-70.)  Tyler's letter to AIG maintained that "the insured, Shirley Bailey, did not intentionally inflict bodily harm or injury to herself.  The vehicle from which Ms. Bailey was fleeing was being driven by her then boyfriend.  An argument ensued between the two individuals and Ms. Bailey was fleeing the vehicle to get away from the driver.  She was attempting to flee a potentially harmful situation."  (<u>Id.</u>)   That same day, counsel for Tyler requested copies of the relevant policies (<u>id.</u> at 79), which were forwarded to him.  (<u>Id.</u> at 72-73).

Then, on January 20, 2005, AIG sent correspondence to Tyler's counsel regarding the appeal.  The letter stated, in relevant part, that the appeals committee meeting was set for February 16, 2005.  (<u>Id.</u> at 67.)  It asked Tyler's attorney to let AIG know if she planned to present "any supporting documentation for the appeal. That is, any evidence that she may have been pushed from the vehicle or any other information you wish to submit."  (<u>Id.</u>)  Tyler did not submit any additional evidence in response, but on  March 25, 2005, Tyler's attorney inquired whether the appeals committee had addressed the claim at its meeting on February 16, 2005.  (<u>Id.</u>)  By letter dated April 7, 2005, AIG informed Tyler's attorney that the claim was not reviewed at the meeting because he never responded to the inquiry regarding whether Tyler would be presenting supporting documentation. (<u>Id.</u> at

64.)  AIG again asked if Tyler planned to submit any materials supporting her request for an appeal.  (Id.)

Then, on June 15, 2005, AIG granted Tyler leave to appeal its decision to deny benefits beyond the 60 day deadline as provided under the ERISA guidelines.  (Id. at 59.)  On July 12, 2005, Tyler's attorney  requested copies of (1) the proof of loss-accidental death claim form dated June 14, 2004; (2) Shirley Bailey's certificate of death signed May 18, 2004; (3) the Alabama Uniform Incident/Offense Report; (4) the autopsy report dated May 18, 2004; and (5) the toxicology analysis report.  (Id. at 33-34.)  The next day, AIG forwarded copies of all requested materials.  (Id. at 35-51.)

Five days later, on July 18, 2005, Tyler's attorney requested a continuance of the August 17, 2005 appeal hearing, so that Tyler could gather additional information for consideration by the appeals committee.  (Id. at 25-26.)  AIG granted this request, and postponed the hearing to October 19, 2005.  (Id. at 23, 28.)

On September 6, 2005, Tyler's attorney submitted a letter detailing Tyler's position on appeal.  (Id. at 10-11.)   Attached to the letter was the only submission throughout the appeal.  That attachment was an affidavit from Tyler.  In pertinent part, the affidavit stated as follows:

Ms. Bailey was a generally happy person and extremely devoted mother. Ms. Bailey would have, under no circumstances, abandoned her daughter by suicide or otherwise. Neither would have Ms. Bailey committed any act that would put her life or her daughter's well-being in danger. Ms. Bailey never once, in ten and one-half years, exhibited any signs of depression or any suicidal tendencies.

(Id. at 12-13.)  On September 9, 2005, AIG acknowledged receipt of Tyler's submission and further offered to consider any other information Tyler wished to provide.  (Id. at 15.)  AIG also advised Tyler's attorney that the administrative record would be presented to the ERISA Appeals Committee on October 19, 2005. (Id. at 9.)

On October 19, 2005, the Appeals Committee met and voted to uphold the original claim denial.  (Id. at 8.)  By letter dated October 25, 2005, AIG notified Plaintiff of the decision and explained its analysis and reasons for the denial.  (Id. at 16-17.)  Five months later, on March 8, 2006, Tyler filed the instant complaint.  (See Compl.)

### IV. ERISA Review Standard

Although ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries, Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989); Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003); Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702, 705 (11th Cir. 1995),

15

the Supreme Court in <u>Firestone</u> established three distinct standards for reviewing administrators's plan decisions: "(1) <u>de novo</u> where the plan does not grant the administrator discretion [i.e., does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] . . . [it has] . . . a conflict of interest." <u>HCA Health Servs. of Georgia., Inc. v. Employers Health Ins. Co.</u>, 240 F.3d 982, 993 (11th Cir. 2001) (quoting <u>Buckley v. Metro. Life</u>, 115 F.3d 936, 939 (11th Cir. 1997)); <u>Shaw</u>, 353 F.3d. at 1282.

Here, the parties agree that AIG did not have discretion to determine eligibility for benefits or to construe the terms of the plan. As such, it is undisputed that the <u>de novo</u> standard applies. "<u>De novo</u> review . . . offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision. In fact, [the court] accord[s] no deference . . . , since, no judgment/discretion was exercised in making the determination . . . ." <u>Williams v. BellSouth Telecomms., Inc.</u>, 373 F.3d 1132, 1137 (11th Cir. 2004).

## V. Analysis

The question presented by the complaint is whether, under <u>de novo</u> review, defendant correctly denied coverage to plaintiff under the policies in place when

16

Bailey died.  To answer this question, the court must look to the policies to see what the policies covered.  The policies at issue are accidental death and dismemberment policies and provide coverage for the death of an insured if the insured is injured, as defined by the policies, and that injury results in death within a year of the date of the accident that caused the injury.  (See Ex. 1 to Zimmerman Aff. at 12, 42.)  An "injury" under both policies is something that is caused by an "accident."  (Id. at 28, 40.)  It is undisputed that the policy was in force when Bailey died.  Therefore, the controlling determination is whether Bailey's injury (and ultimate death) was caused by an "accident."   Because the policies do not define the term "accident," the court must look to case law for guidance.

### A.  Choice of Law

The parties disagree over what law the court should use to define the term "accident" as it is used in the policies.  The policies contain a choice of law provision which states that "[t]his Policy is governed by the laws of the state in which it is delivered."  It is undisputed that the policies were delivered in Alabama.   Plaintiff maintains that under the choice of law provision and Eleventh Circuit precedent, the court should apply Alabama law to define the term "accident."  Defendant argues that the choice of law provision should not be followed, and the court should follow federal common law as developed by the

17

courts in ERISA cases.[14]

Whether the common law of ERISA operates preemptively to preclude enforcement of the agreement of the parties is not an open question in the Eleventh Circuit.  In Buce v. Allianz Life Insurance Co., the Eleventh Circuit held "[w]here a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair."  247 F.3d 1133, 1149 (11th Cir. 2001) (quoting Wang Laboratories, Inc. v. Kagan, 990 F.2d 1126, 1128-29 (9th Cir. 1993)).   In deciding whether to apply a choice of law provision, the Eleventh Circuit instructed courts to determine if the state law is compatible with ERISA and consistent with federal common law.  Id. at 1148.  If "the principles of liability agreed upon by the parties," is consistent "with the language of ERISA or the policies that inform the statue and animate the common law of the statute," then the court should follow the directions of the parties to the contract.  Id.  Therefore, the court must consider whether Alabama law is consistent with ERISA and federal common law.


1.  Alabama Law

---

[14] The court notes that in defendant's supplemental brief (doc. #21) in support of its motion for summary judgment, defendant maintains that even if plaintiff is correct, federal common law and Alabama law apply the same standard.

Under Alabama law, the "term 'accident' has been variously defined as something unforeseen, unexpected, or unusual." <u>United States Fid. & Guar. Co v. Bonitz Insulation Co. of Ala.</u>, 424 So.2d 569, 572 (Ala. 1982); <u>see also</u> <u>Hearn v. S. Life & Ins. Co.</u>, 454 So.2d 932, 933 (Ala. 1984); <u>O'Bar v. S. Life & Health Ins. Co.</u>, 168 So.580, 582 (Ala. 1936).  "Foreseeability of death resulting from the insured's voluntary actions must be tested from the subjective viewpoint of the insured himself." <u>Hearn</u>, 454 So.2d at 934.  That being said, however, the Alabama Supreme Court has also concluded that, "for insurance contract purposes, an insured is not held to intend all the probable or foreseeable consequences of his actions," and "recovery is precluded only where there is a reasonable basis for his belief that his conduct makes serious injury or death a virtual certainty." <u>Id.</u> at 935 (internal quotation marks and citations omitted).  Therefore, under Alabama law there is both a subjective and objective component to the determination.[15]

### 2.  Federal Common Law

Although the Eleventh Circuit has not established a test to determine whether an event or injury is an "accident" under insurance plans governed by

---

[15] The court rejects plaintiff's argument that the Alabama courts apply a purely subjective test to determine whether an injury and/or death was the result of an accident.  However, if plaintiff is correct, the court concludes that Alabama law is inconsistent with the principles of ERISA and the federal common law.  This determination mandates that the court apply federal common law, where there is both a subjective and objective component to the analysis.  As such, as seen below, the court would come to the same ultimate conclusion.

ERISA, it approved of the analysis, albeit in dicta, set forth by the First Circuit in Wickman v. Nw. Nat'l Ins. Co, 908 F.2d 1077 (1st Cir. 1990). Buce, 247 F.3d at 1146-47. Under this test, in giving meaning to the term "accident," the court first asks whether the insured believed that the conduct at issue would result in the sort of injury that was sustained. See Wickman, 908 F.2d at 1088; see also Cozzie v. Metropolitan Life Ins. Co., 140 F.3d 1104, 1109-10 (7th Cir. 1998). If the insured did not believe that the result would occur, the court must consider whether such an estimation can be considered reasonable. Id. If the expectations were objectively unreasonable, then injuries from death resulting therefrom are not accidental. Id.

### 3.  Which Law Applies

The court concludes that Alabama law is consistent with the principles of ERISA and the federal common law developed in this area. Although not as eloquently explained, Alabama uses both a subjective and objective test to determine, for insurance contract purposes, whether a death is accidental. Therefore, under Buce, the court must honor the choice of law provision in the contract and apply Alabama law to interpret the term "accident" in the policy.

### B.  Was Bailey's Death  the Result of an "Accident"?

20

Under Alabama law, there is a prima facie presumption in favor of accidental death.  Mut. Ben. Health & Acc. Ass'n of Omaha v. Reid, 182 So.2d 869, 873 (Ala. 1966).  This presumption may be rebutted by the defendant, "and is not a rigid rule of law."  Id.  The court concludes that the defendant presented sufficient evidence to rebut the presumption.

Bailey's death was not the result of an accident, as defined by Alabama law. Bailey intended to jump from the moving vehicle.[16]  It is undisputed that Bailey opened the car door on her own volition and jumped out of the moving vehicle. She was not pushed out of the car, and there is no evidence in the record that Bailey was threatened by Seagle in any way or that she feared for her life if she remained in the car.[17]  The car door did not malfunction and open by itself.  Bailey knew that she was jumping out of a moving vehicle and intended to do so.

Under Alabama law, the court must look to Bailey's subjective intent as to the "foreseeability of death."   There is no evidence in the record of her subjective intent in jumping out of the moving vehicle other than the fact that she did not

---

[16]  The actual speed the vehicle was moving is not controlling.  What is relevant is that the vehicle was clearly moving at such a speed as to cause the injuries sustained.

[17] This is particularly true because her ten year old daughter was in the back seat of the car when Bailey voluntarily jumped out of the car.  Notwithstanding the January 14, 2005 letter sent by Tyler to AIG during the appeal process, there is no evidence that the argument was particularly heated or threatening in any way.

21

intend to commit suicide.  That she did not intend to die may be true, but she did intend to jump out of the moving car.  The only unexpected thing was the severity of her injuries. That her injuries were greater than might have been foreseeable from her perspective does not necessarily make it an accident.  See Zuliskey v. Prudential Ins. Co. of Am., 48 A.2d 141, 142 (Pa. Super. Ct. 1946).

Additionally, there is a "reasonable basis" that "serious injury or death" would result from jumping out of a moving vehicle.  Hearn, 454 So.2d at 935. Common sense dictates that a person who jumps from a moving vehicle onto an asphalt surface will, at the very least, suffer serious injury.  Not only do the principles of physics mandate this result, but one can also look at helmet laws and the reasons behind them to confirm this certainty.  Moreover, other jurisdictions that have considered the exact and similar situations have also concluded that serious injury and/or death is the foreseeable consequence of jumping from a moving vehicle, and, therefore, not accidental.  See  Zuliskey, 48 A.2d 141, 142-43 (noting that the natural and probable result of jumping from a car moving twenty-five miles per hour is death); Baldwin v. Stonebridge Life Ins. Co., 283 F Supp. 2d 1148 (D. Colo. 2003) (finding that a voluntary jump from a moving vehicle is not accidental in nature); Sizemore v. Nat'l Cas. Co., 151 S.E. 841 (W. Va. 1930) (a person who jumps from a moving vehicle does not sustain an

22

accidental fall).

In sum, the court concludes, using Alabama law, that Bailey's death is not covered under the policies.  Her death is not covered because it was not the result of an "injury" as that term is defined in the accidental death and dismemberment policies.  Therefore, under <u>de novo</u> review, the court agrees with defendant's denial of coverage.

### C.  Does the Self-Inflicted Injury Exclusion Apply?

Whether or not the court is correct that Bailey's death was not the result of an "accident," there is a much simpler reason why the denial of coverage was correct under a <u>de novo</u> standard of review.  Both policies contain an exclusion for intentional self-inflicted injury or attempted intentional self-inflicted injury.  The undisputed record clearly establishes that Bailey intentionally injured herself when she opened the door and jumped from the moving vehicle.  Plaintiff does not attempt to make an argument to the contrary, and completely ignores this argument made by defendant.

When Bailey jumped from the moving vehicle, she did not intend to commit suicide.  She had to know, however, that she would inflict some sort of injury upon herself when she jumped from the car.  Even if that injury did not result in death, the choice of jumping from a moving vehicle necessarily results in injury.

This point cannot be disputed.  The policies explicitly exclude coverage for intentional self-inflicted injury or any attempt.  Bailey cannot escape from this exclusion, and coverage was properly denied on this basis alone.

### VI.  Conclusion

In summary, the court finds that no material issues of fact remain and that defendant AIG Life Insurance Company is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  Thus, plaintiff's motion for summary judgment is due to be denied, and defendant's motion for summary judgment is due to be granted.

A separate final judgment will be entered.

**DONE** this the __1st___ day of May, 2007.

SENIOR UNITED STATES DISTRICT JUDGE